WILLIAM L. WORTHINGTON, ADMINISTRATOR, ETC., v. WILLIAM JAMES MAJOR AND ELIZABETH S. MAJOR.

*Equity practice—Submission of questions to jury—Release of mortgage—Mental capacity of mortgagee.*

1. In the submission of any special question to a jury, whether the verdict is to be regarded as final or as advisory only, the same rules of evidence should be observed as in the ordinary jury trial; otherwise, the verdict should have little weight.[1]

2. Upon the facts in this case (see opinion), a discharge of mortgage, executed by the mortgagee a few hours before her death, is set aside upon the grounds of undue influence and incapacity to make it.

Appeal from St. Joseph. (Loveridge, J.) Argued December 1, 1892. Decided December 23, 1892.

Bill to set aside a discharge of mortgage. Complainant appeals. Decree reversed, and one entered here setting aside the discharge. The facts are stated in the opinion.

---

[1] See *In re Estate of Stebbins, ante,* 304.

*R. R. Pealer* and *George E. Miller,* for complainant..

*Boudeman & Adams,* for defendants, contended:

1. The testimony introduced by the complainant fails to show that Margaret S. Kershaw, at the time she executed and delivered the paper in question, was mentally incompetent so to do, or that she was unduly influenced by any one to do it.

2. As to the value of expert testimony, counsel cited *Rutherford v. Morris,* 77 Ill. 397; *Ferguson v. Hubbell,* 97 N. Y. 507; *Van Wycklen v. City of Brooklyn,* 118 Id. 424; 1 Whart. Ev. § 722;. *Beaubien v. Cicotte,* 12 Mich. 501.

3. It must be conceded that no greater mental capacity would be required to make the gift here made than to have made a will; citing *Van Deusen v. Rowley,* 8 N. Y. 358; *Crum v. Thornley,* 47 Ill. 192; 2 Schouler, Pers. Prop. §§ 59, 141.

4. In this State the Court has held that, to make a testator competent, he must have sufficient active memory to collect in his, mind, without prompting, the elements of the business to be transacted, but need not have the same perfect and complete understanding and appreciation of all these matters in all their bearings that a person in sound and vigorous health of mind and body would have; citing *Kempsey v. McGinniss,* 21 Mich. 141, 142; and, whatever a person's mental disorder may be, the instrument will not be set aside unless such disorder is shown to have been sufficient to affect, and that it did affect, the making of the instrument; citing *Fraser v. Jennison,* 42 Mich. 206.

5. This Court has held that undue influence, in order to affect a business transaction,—a will, a deed, or a gift,—must be such as to destroy all freedom of action at the time of the particular transaction; citing *Maynard v. Vinton,* 59 Mich. 139; *Potter's Appeal,* 53 Id. 106; *Latham v. Udell,* 38 Id. 238; *Pierce v. Pierce,* Id. 412; and, further, that influence by moderate persuasions, or arguments addressed to the understanding, or an appeal to the affections, is not undue influence; citing *Schofield v. Walker,* 58 Mich. 96.

6. This transaction was, no doubt, a gift *causa mortis.* If Mrs.. Kershaw had recovered, the law would have revoked the gift, and she could have recovered the property; citing *Emery v. Clough,* 63 N. H. 552; *Kiff v. Weaver,* 94 N. C. 274; *Parcher*

*v. Savings Institution,* 78 Me. 470; *Taylor v. Henry,* 48 Md. 550; *Dickeschied v. Bank,* 28 W. Va. 340.

7. Where a party draws out in an examination under the statute a part of the facts regarding a transaction, and offers and puts them in evidence, the statutory exclusion of the witness is waived, and so the courts have held; citing *Smith's Appeal,* 52 Mich. 415; *Beardslee v. Reeves,* 76 Id. 661.

8. Where the relations between the parties are only natural relations, the law does not apply the doctrine of constructive fraud, and impose upon the claimant the burden of showing the fairness and good faith of the transaction; citing *Jenkins v. Pye,* 12 Pet. 253; *Howe v. Howe,* 99 Mass. 88; *Saufley v. Jackson,* 16 Texas, 584; *Cowee v. Cornell,* 75 N. Y. 100, 101.

McGRATH, C. J. This is a bill to set aside the discharge of a mortgage executed by complainant's decedent a few hours before her death, on the ground of undue influence and incompetency.

On December 31, 1888, William James Major executed to his sister, Margaret S. Kershaw, a mortgage for $14,689.77, and, as collateral thereto, assigned to her bank stock, the par value of which was $2,000. In February, 1890, Margaret S. Kershaw and her mother were living in a small cottage on the farm owned by defendant, and about 80 rods from defendant's residence. John S. Major, another brother, and the only other member of the family, owned an adjoining farm, and resided about five-eighths of a mile east from William's residence, which was about one mile and a quarter from the village of Centreville.

On Saturday, February 8, 1890, Margaret and her mother were both indisposed, and were brought to William's residence. The doctor was called in that day; visited them again on Sunday, on Monday at noon, and also at about 6 o'clock in the evening, remaining until 7 o'clock, and pronounced her much worse; was called again Tuesday morning at 5 o'clock, and found her failing rapidly; called again at 11 o'clock, and found her in a comatose condi-

tion; and at 1 o'clock she died. The discharge of the mortgage purports to have been executed on Monday, the 10th, and it is alleged to have been executed at about 10 o'clock at night. The discharge contains the following recitation:

"And now, being sick, and not expecting to live, and being desirous of giving to said William James Major all my worldly possessions, to the exclusion of all my other relatives, and all worldly possessions being represented by said mortgage, and the notes accompanying it, I therefore hereby fully discharge said mortgage and the said indebtedness, and release the said William James Major from all liability upon the same, meaning to make full release of all claims I have against said William James Major, and choosing this method, instead of willing said mortgage and notes to him; and I therefore hereby declare that said mortgage is fully paid, satisfied, and discharged."

The only persons present at the execution of the paper were William J. Major, the attorney who prepared it, and one William Meyers. William J. Major testifies that he had been involved for some time in a legal controversy with one Todd, his brother-in-law, with whom he had been in partnership, and that a bill had been filed against him claiming a large indebtedness; that his sister had frequently spoken to him with reference to this mortgage, saying that she wished that the Todd matter could be arranged so that she could discharge the mortgage; that—

"During the afternoon [on Monday] she spoke again in regard to this mortgage and the Todd matter, and she said she really wished it could be fixed up. She said that she wanted to send down for the attorney, naming him, and have him come up and have him make a release of the mortgage and an assignment of the bank stock. I told her I thought that the Constantine Church case was in progress; that he couldn't come until evening. The doctor went away that evening, just as we were ready to sit down to supper. After supper I went back into the room, and she said, 'You haven't sent for the attorney, have you?' I told her, 'No; I have not.' She said, 'I wish you would

:send for him right away.' So I went out and told the hired man to hitch up the horse; that I wanted him to go over to town. I went back, and wrote a note to Meyers for him to see the attorney, and to have him bring up a release of mortgage. Just then John S. came, and I gave the note to Ernst, and sent him to Meyers. John came in and spoke to my sister, and was about going away, and did not sit down. She said, 'Stuart, stay awhile, and sit down and talk a little.' He sat down, maybe 10 minutes, and then went out into the sitting room. He stayed perhaps half an hour."

That Meyers and the attorney came between 9 and 10 o'clock that evening; that the attorney prepared the discharge, and his sister executed it, and also executed an assignment of the bank stock.

The attorney says that Meyers came for him; that he was busy in the office; that he sent word to Meyers that he was busy; that, after he got through with his business,—

"I don't know what time it was, but I judge it was half past nine,—I went out into the other office, and found Mr. Meyers, and we rode up to the house. I went into the bedroom. She put out her hand. I took it. I said, 'Mrs. Kershaw, you are sick, and I did not hear of it until this evening.' She said, 'Yes; I am quite sick;' and she said, 'I sent for you.' I said to her, 'What do you want?' and she said, 'I want to discharge the mortgage that I hold against James, and I want to give him what I have got.' That is as near as I can recollect it. I don't remember the exact language. I said to her, 'Mrs. Kershaw, would it not be better to make a will?' And she said, 'I don't want to make a will. I prefer to discharge the mortgage.' And I had some other talk with her, quite a considerable of it, and the talk was probably five or ten minutes. I then said to her, 'Very well, I will draft the paper;' and I stepped out. I said to her, before, that I would have to have the mortgage, and she said, 'James will get you the mortgage.' I stepped out into the other room, and said, 'Mr. Major, Mrs. Kershaw wants me to discharge the mortgage that she holds against you. Where is it?' James gave me the mortgage. I took the mortgage, and sat down and drafted the discharge, and,

after I had drafted it, I took it up and went into the bedroom where Mrs. Kershaw was, and I read it to her, and asked her if that was what she wanted, and she said, 'That will do.' That is the language she used, as near as I can recollect. 'Very well, then,' I said, 'you sign it;' and I handed the paper to her, and I got a pen and some ink and a book, and gave her the book, or I put it down, and she started to write, lying down. She said, 'I can't write my name lying down. You will have to lift me up.' She then sat up in bed, with her feet out of bed, her book on her lap, and signed her name to the paper. I recollect that she didn't sign it very well, and she looked up with a kind of a smile, and said, 'Is that all right?' And I looked at it, and said, 'Yes.' I said to her, 'You acknowledge this?' And she said, 'I do;' and then Mr. Major, I think, handed me the bank stock. I didn't notice what it was. I hadn't brought an assignment for that. It was all on the blank upon the back, filled out. I said to Mrs. Kershaw, 'Here is the bank stock. Do you want to assign that?' She said, 'Oh, yes,' and wrote her name on that, and handed it back to me; and I said to her, 'What shall I do with these papers?' She said, 'Deliver them to Mr. Major,' or 'Deliver it to James.' Meyers signed as a witness, and I handed the bank stock to James, and left the mortgage and notes lying on the table."

Meyers says that he went to the attorney's office,—

"And he came out and told me he would be ready in about half an hour. I went over home and stayed half an hour, and then went back, and the attorney was not quite ready then, and I waited a little while. When I got up there, I helped unhitch the horse, and when I went into the house the attorney was busy writing. Afterwards he took a paper that he had been writing, took it into the bedroom where Mrs. Kershaw was lying on the bed, and read it to her. He afterwards came out and acknowledged it, and I think asked me to sign that, and I did. I was standing near the door of the bedroom, heard him read it over to her, and saw her sign the paper. As near as I can remember, he asked her whether that was what she wanted, and the reply that I heard was, it was."

John S. Major testifies that he and his wife called at

William's house on Monday evening about 7 o'clock, and
remained two or three hours, until half past 9 o'clock,
standard time; that, on the way home, they crossed the
railroad track, and the train due at 9:30 crossed the high-
way in front of them; that, when he drove into the yard
of William's house, he saw Ernst, the hired man, hitching
a horse to a buggy; that, after they had gone into the
house, "Ernst came into the house in a few moments, with
his cap and overcoat on, and he waited a few minutes as
if waiting for orders, and they told him to put his horse
out, that he need not go now;" that, at about 8 o'clock,
the hired man went to his room. He further testifies that
he and his wife offered to stay all night, and assist in the
care of the sick, but their offer was declined. He denies
that during his stay his sister volunteered any remark to
him. John's wife corroborates him in this story.

Ernst is sworn, and says that on Monday evening,
when John S. Major came to the house, he (Ernst) was
hitching up the horse to the buggy; that defendant Wil-
liam had told him to do so; that, after hitching up, he
tied the horse to a post, and went into the house, and
asked what they wanted in town; that Mrs. Major told
him to go and hitch the horse in the barn; that he did
so; that he did not take the harness off, because Mrs.
Major said they wanted it ready; that he then went into
the house, and went to his room, and remained there
some time; that afterwards William Major called him, and
told him to hitch the horse to the buggy, and go down
and get Meyers and the attorney; that he first went to
Meyers' house, and Meyers got into the buggy, drove down
street, and hitched the horse in front of Wolfe's Bank; that
Meyers then went to the office of the attorney; that one
Wilson, the village marshal, came along at that time, and
asked what they were there for, at that time of night,
and Meyers said, "we are over for the doctor." Wilson,

the village marshal, testifies to this same conversation, and says that it occurred just as Meyers and Ernst drove up to hitch the horse in front of Wolfe's Bank, and he fixes the time at "close to 10 o'clock;" that the stores were all closed, the lights all out, and the hacks had returned from the depot, where they had gone to meet the 9:30 train; that Meyers went towards the attorney's office.

Meyers was an old employé of William's, and William, in his testimony, at first strives to create the impression that the note was sent to Meyers because Ernst did not understand English, but, after some evasion, he admits, upon cross-examination, that the purpose in sending for him was that he should witness the execution of the instrument. If the witnesses John S. Major and his wife tell the truth, then it was about 10 o'clock, local time, when they left William's house, and it is not true, as William says, that they remained but a few minutes. If what John S. and his wife say relative to the direction of Ernst's movements is true, and Ernst's testimony is correct as to his detention, then William's story is not true, and there was an evident design to clothe what was done with secrecy. If what Ernst and the marshal say is true, as to Meyers' statement that they were after the doctor, then it would seem that he, too, was in the plot, and had been enjoined to secrecy. If the statement alleged to have been made by William to his sister in the afternoon of Monday, when asked why he had not sent for the attorney, was true, it showed a familiarity with the attorney's movements. If it was not true,—and the attorney says that the case was at issue, but not on trial, on that day,—then it discredits William's statement as to the whole of the alleged interview with his sister. If what John says as to when he left the house on Monday night, and the village marshal's statement as to when he saw Meyers and Ernst, are also true, or if either is correct, and it is true that Meyers and Ernst

waited some time for the attorney, it must have been at least 11 o'clock before the papers were prepared and ready for execution. If William's statement that his sister, as early as Monday morning, had expressed a desire to discharge this mortgage, there seems to be no valid reason given why an opportunity was not given her. It does not seem probable that the mortgagor would delay the execution of the expressed desire of the mortgagee to discharge a mortgage amounting to $14,700 until midnight of that day. This was Monday night. The doctor had informed the family that the sister was much worse. The mother lay seriously ill in another room. The sister dies the next day, and the mother the day after. It was not improbable that John and his wife should proffer their assistance for the night, and it was but natural that it should be accepted. There is nothing improbable in the story told by John and his wife, either as to what occurred or as to the sister's condition on Monday evening; and upon all points they are corroborated, except by William and his wife. They tell substantially the same story as to decedent's condition on Monday evening that the physician tells, and as to the incidents of that evening the testimony of Ernst and Wilson supports them. John S. and wife were there on Tuesday morning. Both say that Margaret was unconscious; that, while there, the mother remarked that men had been there during the night, and that she ·didn't know whether it was right or not; that this statement she repeated, and Mrs. William J. Major, who was present, said "she didn't know what made mother talk so, unless it was the medicine they were giving her." John S. testifies that he knew nothing of the discharge of the mortgage until after the appointment of the administrator, who, when he was collecting *data* to prepare the inventory, was told by William of the discharge.

Mrs. Kershaw died of double pneumonia. Dr. Sabin,.

her physician, says that at his first visit, on Saturday, he found her temperature high, pulse rapid, tongue covered with a white coat, having a yellowish tinge; that she had had a chill; that she had a peculiar dusky, haggard, and tired look; expectoration rusty; an oppressed condition of the nerves; breathing difficult; the right lung was congested, the back part especially; complained of pain in her chest, and difficulty in respiration; and which confirmed the idea that she had inflammation of the lungs, with a high fever.

" Thought there were malarial complications, and addressed myself to the removal thereof.

" On Sunday, at 9 A. M., visited her again; found the bilious complication somewhat relieved, but the lungs no better; the inflammatory action was extending, and more advanced than I had anticipated; auscultation revealed crepitation in the left lung, and difficulty in the respiratory murmur in the right; the difficulty was increasing; half of the left lung and a quarter of the right was inflamed; temperature high; pulse rapid; breathing not so labored, but shallow; her general appearance was better, but progress had been made in the lung complication; no material change in the nervous system; same haggard look and tired expression; expressed pain in breathing in her left side, and a sense of fullness in the right.

" Monday noon found her in bed; she was worse; two-thirds of the left lung was involved, and three-quarters of the right was solidified; discovered crepitation in the right lung; inflammation extending more rapidly in the right lung; there was more duskiness in the face, and an inclination to drowsiness; the sputa had changed from a rusty to a prunish color, denoting an extension of the inflammatory process, more blood in the air cells, and destruction of lung tissue; the breathing and respiration had increased rapidly, probably 20 per cent.; the face was flushed; there were nervous symptoms, and very much more prostration than on the previous day; talked with her considerably; told her that I desired to arrange, and did arrange, a paper in a pan so as to catch the sputa, and explained that I wished to observe the changes therein, and she understood me.

" On Monday evening, about six o'clock, I found her failing; the prune-colored expectoration was more fluid in

its character, indicating an advance of the inflammation, and destructive tendency; the respiration was rapid, shallow, and labored; temperature very high; pulse rapid, and not so strong as on the previous visit that day, indicating failure; she had more of the cyanotic or dark bluish look; the stupor was increasing; examined the sputa, and she asked, 'Is that what you expected?' That is all the talk I had with her. I was there for an hour, but had no conversation.

"Q. Did she reply to your inquiries or talk?

"A. Well, not much. When I could get her attention, she did reply to some, I think. It was more difficult to get her attention and arouse her, but I think she understood. Her replies would be short, because of difficulty and pain in talking. After answering the questions that were put to her, she would fall back in a stupor or sleep. She spent most of the time in a sleep or stupor, because she only talked when you talked to her. It was somewhat difficult to arouse her. I told the family, soon after I saw them that evening, that she was very bad.

" On Tuesday morning, at five o'clock, I found her much worse, and failing evidently; the crepitation was more marked over the left lung, and she was perspiring; there was a dusky look, and some little coldness on the surface; the left lung was probably not much more involved, but the right was thoroughly filled up; there was but a quarter of the left lung fit for duty; her breathing was very rapid, and there was a rattling over the chest; there was an opening and shutting of the nostrils in breathing; she breathed probably 60 times a minute; the expectoration indicated a breaking down of the lungs; the stupor was very much worse, and more marked; I remained there until eight o'clock."

During this visit it does not appear that the patient spoke a word. At noon the doctor visited her again, and found her in a comatose state. She died at 1 o'clock. Death resulted from the filling up of the lungs with mucus, in the progress of the disease.

Counsel for both sides seem to have studiously avoided any questions to this witness as to the competency of the patient on Monday evening, or at any later period, to comprehend a matter of the nature of that involved. Dr.

Sabin had said, however, that, so far as he had any con-
versation with the patient, her answers appeared to be intelli-
gent and rational.   A number of prominent physicians were·
called by each party as experts, but the opinions given by
them were predicated upon entirely dissimilar hypotheses.
The hypothetical question submitted by the counsel for
defendants, after reciting the course of the disease, and
the symptoms up to and including the last visit made by the·
doctor on Monday, concluded as follows:

" That during the afternoon of that day she requested
that an attorney be sent for, for the purpose of discharg-·
ing a mortgage which she held against her brother, with
whom she had always been on intimate terms, and on
Monday evening she again made the same request; that the·
attorney was sent for, and arrived about nine o'clock in
the evening, and when he came she told him that she·
wished to discharge the mortgage in question, and to·
give everything over to her brother, and the attorney drew
the paper, discharging the mortgage, and assigning the·
property to her brother; that it was read over to the·
patient, and she said it was as she wanted it, and she·
signed and acknowledged the paper, and the notes and
·mortgage were then turned over to her brother, by her·
direction; that up to this time the patient had shown no
delirium in her conversation, but had always talked ration-
ally.   Under those circumstances, what would you say as
to whether or not, in your opinion and judgment, the
patient was mentally competent to do the business which
she did transact, and to fully understand and appreciate
its import?"

Invariably the answer was, " I should say the patient
was competent," or, as one of the witnesses said, " I
should think from the whole question, and especially the
latter portion of it, she was competent to do any business."
It was hardly necessary to call an expert to answer that
question.   The real inquiry here is whether the testimony
·of the witnesses who testify to the occurrences after the
brother left on Monday evening is credible; whether the
capacity indicated by this testimony was consistent with

the condition of the patient at 7 o'clock Monday evening, and at 5 o'clock Tuesday morning.

The experts all agree that the lungs are a chemical laboratory, where the blood is purified and made nutritious, and the carbonic acid gas is thrown out and off; that this carbonic acid gas is poison; that, in the event of the inability of the lungs to perform their functions, the carbonic acid gas accumulates in the system, depresses the vital forces, and poisons the nerve centers and the brain; that in some cases delirium results, in others, stupor; that stupor indicates brain poisoning; that the cyanotic or dusky hue of the countenance indicates the carbonization of the blood, and that the supply of oxygen is insufficient and the condition serious; that there are three stages to the disease; that stupor or delirium manifests itself first in the second stage; that the third stage is the process where suppuration begins, in which there is congestion, hepatization, and softening; that this softening may result in rotting, or it may turn towards health; that the testimony of Dr. Sabin showed a steady progress of the disease through these several stages, and that the patient had reached the last stage on Monday evening; that her condition at that time was serious; that the condition Tuesday morning indicated a constant progression of the disease; that the symptoms clearly indicated the gradually increasing stupor, until it reached the comatose state which, Dr. Sabin describes, existed at 11 o'clock on Tuesday.

None of the expert testimony even suggests the probability of a cessation of this progression, of this increasing stupor, between the hours of 7 o'clock Monday evening and 5 o'clock Tuesday morning. There is a seeming conflict in the testimony of the experts as to the mental comprehension of the patient on Monday evening, but this conflict is largely due to the failure to get before the

94 MICH.—22.

witnesses the same conditions. It is clear from the testimony of Dr. Sabin that the stupor had advanced on Monday evening so that it was difficult to arouse her; so that the brain was inactive; so that there was no affirmative operation of that organ, and the mind was incapable of suggestion. The testimony as to the transaction four or five hours later indicates not alone capacity to comprehend, but activity of the brain, and exertion, inquiry, request, suggestion, dictation, and direction on the part of the patient. There is no pretense that she was aroused, her condition suggested to her, asked if she desired to make any disposition of her property, or even this disposition suggested to her; but it is alleged that she, of her own volition, gave minute and explicit directions, and exercised a choice as between a will and the discharge. The doctor informed defendants on Monday evening of her condition, but no word of inquiry is addressed to him by them as to her capacity to do what it is alleged by them that she had contemplated and had suggested a desire to do.

It is only from the defendants, Meyers, and the attorney sent for to prepare this discharge, that there is any testimony indicating mental activity after the doctor's visit on Monday evening. William J. Major says that, at 9 o'clock Tuesday morning,—

"I raised her up, and gave her the medicine, and she said she would like to sit up a little while. I bolstered her up with pillows in the bed, and she asked me if I thought she was dangerously sick; and I told her in reply that anybody with pneumonia was always dangerously sick, but I said to her I hoped she would be better in a day or two. She said, 'You look sick, too. You have been up two or three nights, and you ought to go to bed and sleep, for you look sick.'"

Elizabeth S. Major says that on Tuesday morning she conversed with her long enough—

"So that she inquired how mother rested, and if I had turned the bed head towards the north. When they came home the head of the bed was towards the west, and when mother occupied the room we always had it towards the north, because mother felt so much more at home with the bed standing that way. She asked if I had slept any during the night, and if I was tired."

This testimony is utterly irreconcilable with that of the physician, and with all the testimony as to the probabilities. Dr. Sabin had been instrumental in separating the mother and daughter on Monday noon. The two were much attached. The doctor came on Monday evening to see both patients. Not a word is said by her to the doctor as to her mother's condition. Her mother had been living with her, and it does not appear that her mother had any property, at least sufficient for her support. She is alleged to have conveyed away all she possessed, without reference to the attachment she had evinced for her mother, and without any reference to her. At 7 o'clock Monday evening the doctor leaves the patient in the condition described by him. Four or five hours thereafter the discharge is executed. At 3 o'clock Tuesday morning her condition becomes alarming to defendants. Ernst is sent away to notify John, and to bring the doctor and Meyers. The doctor gets there at 5 o'clock. He finds no unusual condition, but that the disease and stupor and weakness have progressed during the hours since the last visit. He remains until 8 o'clock. At 9 o'clock, William alleges, the patient asks to sit up in bed, and asks if he thinks she is dangerously sick; tells him that he looks sick, and that he ought to go to bed. At 11 o'clock the doctor returns, and finds her in a state of coma, and, as he terms it, "about dead."

Wherever the testimony of defendants respecting the condition of Margaret S. Kershaw after 5 o'clock Monday

evening relates to a period of time covered by the observa-
tion of the physician, it is in conflict with that of the
physician; wherever it relates to a proximate time, it is
entirely inconsistent with that of the physician; and wher-
ever it relates to a more remote period, it is not only
utterly inconsistent with that of the physician, but it is
opposed to all the probabilities. The circumstances attend-
ing this midnight transaction, and the atmosphere of con-
cealment that pervaded it, throw suspicion upon the entire
transaction. The testimony associates with this transaction
conduct on the part of the beneficiaries incompatible with
a belief in her mental capacity. It discloses conduct on
the part of one of the witnesses, who claims to have been
present, indicating a participation in the efforts to conceal.
The instrument prepared for signature recites more than
was necessary in a simple discharge, and its preparation
indicates a desire to protect the beneficiary, and puts into
the mouth of this dying woman words that she had not
uttered.

A jury was called at the instance of complainant, and
the question of undue influence and incompetency sub-
mitted, and the jury found for defendants. A motion was
made to set the verdict aside, and the circuit judge granted
the motion, treated the case as having been heard without
a jury, and dismissed the bill. It is urged that the find-
ing of the jury, and the conclusion of the court below,
should be regarded in the consideration of the case here.
How far the conclusion of the court below was affected by
the finding of the jury we are not advised. A large mass
of incompetent testimony was calculated to influence and
bias the jury; was admitted under objection; and, in spite
of objection, the court treated the trial as a chancery
hearing, and declined to interfere. In the submission of
any special question to a jury, whether the verdict is to be

regarded as final or as advisory only, the same rules of evidence should be observed as in the ordinary jury trial; otherwise, the verdict should have little weight.

The decree of the court below is reversed, and a decree entered here for complainant, setting aside the said discharge of the mortgage; and the record will be remanded for further proceedings, relating to the foreclosure of said mortgage. The rights of the wife can be fully protected in that proceeding. Complainant will be entitled to costs.

The other Justices concurred.